Filed 2/18/21  P. v. Gosztyla CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHANTELL JEANNETTE GOSZTYLA et al.,<br><br>Defendants and Appellants. | C088530<br><br>(Super. Ct. No. 18FE004488) |

A jury found defendants Chantell Jeannette Gosztyla and Richard Joseph Gosztyla[1] (collectively defendants) guilty of committing multiple oral copulation and lewd and lascivious acts offenses against Chantell's daughter (the victim).  On appeal, defendants argue the trial court erred by failing to investigate potential juror bias.  They further argue the court erred by admitting the victim's forensic interview into evidence,

---

[1]     Because defendants share a last name, we refer to them by their first names.  No disrespect is intended.

1

as well as an expert's opinion related to child sexual abuse accommodation syndrome (accommodation syndrome), and several of defendants' Internet searches for lawful pornography. Also related to accommodation syndrome, defendants contend their attorneys were ineffective for failing to object to the prosecutor's improper hypotheticals and the court improperly instructed the jury regarding the evidence's purpose. Defendants further contend the prosecutor committed two instances of prejudicial error, one their attorneys failed to object to and the other brought to the trial court's attention in a mistrial motion. In the event we determine no single error sufficiently prejudiced defendants, they argue cumulative error requires reversal of their judgments. Finally, defendants argue we must correct their abstracts of judgment to accurately reflect the trial court's oral pronouncement.

We agree with defendants that their abstracts of judgment must be corrected. We otherwise affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The victim was born in January 2011. By early 2016, Chantell was divorced from the victim's father and was the victim's sole caregiver. While the victim had contact with her father, the contact was intermittent and occurred only with Chantell's permission. The victim's father was required to, but did not, pay child support.

In February 2016, defendants were in a romantic relationship. Chantell and the victim moved into Richard's parents' house with Richard and his mother. Richard's father was not living in the home because he worked far away. In September 2016, Richard's father returned, and Richard's parents moved out of the house to let defendants and the victim live alone together. Defendants married at that time but did not plan to have a wedding ceremony until the next year.

The victim was close to Richard's parents. She saw them once a week for dinner and would often spend the night with them alone. The victim was also close to Chantell's parents and spent nearly every weekend with them, although Chantell and her

2

parents did not get along. Neither Richard's parents or Chantell's parents noticed anything about the victim that would cause them to be concerned.

After Richard's parents moved, defendants started asking the victim to join them in their bedroom. Usually Chantell asked, but sometimes Richard or both defendants asked her. They always asked the victim to join in a "nice way." The victim "almost about every time" joined defendants because she wanted to spend time with them. Defendants were busy doing their own things -- Chantell studying to become a teacher and Richard playing his game -- causing the victim to not see them often. When the victim went into defendants' bedroom, defendants played with their own private parts and each other's private parts. They did it on a made-up bed, while the victim sat next to them on the bed sometimes watching her tablet. While the victim was in defendants' bedroom, she saw defendants watching other people on a computer playing with their private parts.

Usually defendants just touched themselves or each other, but sometimes they asked the victim for help by moving her hand up and down Richard's private parts while Chantell had his private parts in her mouth. The victim complied because she did not want defendants to feel bad for wanting her to join them.

Defendants also asked the victim to lick Richard's private parts. She did not want to and did not like the taste when she tried. Defendants asked if she would try again with a "gel or something." In early July 2017, defendants bought strawberry and mint lubricant. They put the strawberry gel on Richard's private parts, but the victim did not like it because it only had a "little bit of strawberry to it." She also tried licking Richard's private parts with mint gel but did not like that either.

Sometimes defendants played with the victim's body when she was in their bedroom. Richard licked the victim's private parts and touched her private parts with his finger. He used his tongue and finger in a zig-zag and it felt weird. One time, Richard

3

licked the victim's private parts in the living room when Chantell was not there. Sometimes Chantell also kissed the victim on the victim's private parts.

In total, the victim believed she helped defendants by moving her hand up and down on Richard's private parts three or four times. She believed she put her mouth on Richard's private parts three times and Richard put his fingers on her private parts four or five times. She also believed Richard put his mouth on her private parts once or twice.[2]

In early September 2017, Chantell sent the victim to live with her father so defendants would be able to move to Southern California and establish themselves before the victim joined them there. Chantell told the victim's father that once the victim moved to Southern California, he would never see the victim again. Later that month, defendants held their wedding ceremony.

In early October 2017, the victim told her father she had a secret involving defendants. The victim's secret caused her father to contact child protective services and the Sacramento County Sheriff's Department. On October 10, 2017, defendants left for Southern California. On their way out of town, Chantell called her parents and told them any allegations they heard against her were false but that she was leaving town and would never see them again.

The victim was later interviewed at the special assault forensic evidence center. During the forensic interview, the victim said defendants often asked her to join them in their bedroom when she was playing alone. It seemed they wanted to spend time with her. Sometimes Chantell would ask the victim, sometimes, Richard. The victim said that because she wanted to spend time with defendants, she joined them in their bedroom, but sometimes with her tablet. When she went into defendants' bedroom, they usually got naked and touched each other's private parts. The victim said defendants also watched

---

[2]     The above facts were summarized from the victim's trial testimony.

4

videos on Richard's computer of teenagers and grownups doing the same thing defendants did. The victim said she usually sat or lie on the bed with defendants while defendants touched each other. Sometimes the victim was naked, sometimes she was not.

During the forensic interview, the victim said sometimes defendants asked her if she wanted to help. They asked her to put her mouth on Chantell's private parts, but she did not want to. Sometimes Chantell put her mouth on Richard's private parts and the victim would help make his private parts go "up and down -- up and down." The victim said defendants also asked her to lick Richard's private parts, but when she tried, she did not like it. So defendants bought strawberry paste and mint paste, but the victim still did not like doing it. The victim further said Chantell told her she did not have to lick Richard's private parts if she did not like it, but Richard told her she may try it when she was older.

During the forensic interview, the victim also said Richard sometimes put his tongue and finger on the part of her body she used to go to the bathroom. She was naked when Richard did this. When using his finger, Richard would make a circle. The victim said Richard put his mouth on her private parts once while he and the victim were in the living room together without Chantell. Once, Chantell touched the victim's private parts and kissed it too.

During the forensic interview, the victim said she believed she moved Richard's private parts up and down twice. She believed she licked his private parts three times. She believed Richard put his mouth on her private parts one or two times and touched her private parts with his finger four or five times. The victim said defendants told her not to tell anybody because it was "private."

After spending time in Southern California, defendants spent the next several months traveling around the United States staying with family and working for employers that provided room and board. During this time, the victim's father was involved in family court proceedings with Chantell. He also moved with the victim out of state,

5

causing a custody dispute between Chantell's parents and the victim's father. The victim's father did not always appear for family court hearings and disobeyed some family court rulings. In March 2018, defendants were arrested in Napa.

A search of defendants' electronic devices revealed that between July 2016 and March 2018, defendants searched and watched a lot of lawful pornography. A portion of that lawful pornography included videos entitled: "Daughter watches mom suck dad's dick"; "Mom teaches daughter to suck dad's dick"; "First time stroking a cock"; "Mommy fucks daddy in front of daughter"; "Daughter learning how to suck daddy cock"; "Mom and dad seduce daughter"; "Daughter sucking dad"; "Family forced abuse"; "Mom and dad incest with daughter"; "Daddy rubs daughter's pussy"; "Daughter learns to suck daddy's cock"; "Mom and dad teach daughter how to fuck"; "Mom teaches daughter blow job"; "Daughter sucks dad's cock"; "Daughter sucks daddy for the first time"; "Mom and dad use daughter like little slut"; "Daughter takes daddy's pants off and sucks"; "Daughter and mom suck on daddy"; "Super Horny daughter Wants Step-daddy"; "Tiny baby takes down a massive cock"; "Daughter fucks daddy porn"; "Wife holds daughter down"; "Daughter used by dad"; "Daughter riding dad"; and "Daddy touches daughter." (Italics omitted.)[3]

At trial, Chantell testified the victim had occasionally walked in on her and Richard engaging in oral sex and intercourse, during which defendants watched pornography. Chantell testified defendants had a very active sex life and watched a lot of pornography of varying types, including that contained in their search history and read to the jury. Chantell testified she and Richard searched those particular topics because the women who appear in father-daughter, role-play pornography typically match Chantell's petite body type.

---

[3] One title for nearly every month between July 2016 and March 2018, was read into evidence. Defendants searched numerous other times for similar content.

6

Chantell testified that while the victim's father believed Chantell was going to keep him from seeing the victim, Chantell had no intention of doing so. She further testified that in early October 2017, the victim's father did not answer her calls or let her speak to the victim. Chantell later learned of the victim's allegations and believed it was the victim's father saying these things to get custody of the victim. Chantell testified that the victim's father coached the victim "to say she's been a part of activities that she has not been a part of." He further wanted custody of the victim so he could move with his new family out of state. Chantell testified that nobody in the family court system or child protective services ever told Chantell how to fight the allegations made by the victim. Chantell's plan was always to save money and fight to regain custody of the victim when she could afford it.

A jury found defendants guilty of multiple counts of oral copulation with a child under the age of 14 years and lewd and lascivious acts on a child under the age of 14 years. The jury further found defendants had substantial sexual contact with a child under the age of 14 years. The trial court sentenced each defendant to a total of 75 years to life plus 16 years. It further imposed various fines and fees.

Defendants appeal.

DISCUSSION

I

*The Trial Court Did Not Err By Failing To*

*Hold A Hearing To Investigate Jury Contamination*

Defendants contend the trial court erred by failing to question Juror No. 11 about her inattentiveness and nonverbal communications with the prosecutor. They further argue the trial court was required to question the entire jury concerning potential bias stemming from the prosecutor's expressions of disbelief and inaudible laughter during Chantell's testimony. We disagree.

7

## A

### *Background*

The trial court granted defendants' motion in limine urging all counsel to limit their facial expressions during testimony out of fear jurors would interpret the expressions to either vouch for or call into question a witness's credibility.

During Chantell's testimony, Richard's attorney objected to the prosecutor's facial expressions, explaining that "[a]s [Chantell] is testifying, [the prosecutor] is over there laughing, and Juror Number Eleven is looking at [the prosecutor] as she is making these facial expressions, and it -- it is not for the jury to look at how the District Attorney is interpreting what [Chantell] is saying." The trial court indicated it did not see the prosecutor's facial expressions or the juror's reaction, but invited comment from the prosecutor. The prosecutor responded, "I can't really address that, Judge. I probably have made some expressions because I just can't help myself, to be honest with you. I am not overtly trying to draw any attention to myself or to my personal feelings . . . ."

The trial court reminded the parties of the in limine ruling regarding facial expressions. It further added, "I do want to offer parenthetically, [Richard's attorney], that understanding that was your motion, and, candidly, in making of your motion, you conceded that is something you do and you would try not to do that. . . . [¶] And you have repeatedly done that during the course of the trial. So it's not like one side is doing this . . . ." Richard's attorney responded, "[w]e are talking about [Chantell] testifying. And if [the prosecutor] is overtly laughing -- unaudibly (sic) but laughing, and jurors are looking at that, that's a problem." The trial court replied, "[i]t's a legitimate concern that you raised, and I addressed it, and I do mean it that I want all counsel to refrain from making any kind of facial expressions that communicate to the jury."

Following this interaction, the trial court took a recess. After the recess, Chantell's attorney raised another issue regarding Juror No. 11. He asserted Juror No. 11 appeared to not be listening because she was staring into space and looking at anything

8

other than Chantell.  Chantell's attorney further argued, Juror No. 11 "has been making faces both towards [Richard's attorney] as well as [the prosecutor] during the course of [Chantell's] testimony."  Richard's attorney added that Juror No. 11 had made an audible sound during the arresting officers testimony.

The trial court said it was "unaware of this, but I -- and I have been watching the jurors on a regular basis.  I will make note of Juror Number Eleven and take a closer look.  [¶]  But having said that, none of the things that you have identified as bullets to put on this record are necessarily a problem or necessarily a reason to have reservations or concerns about a juror.  [¶]  Listening is a relatively passive event in its appearance, and I don't require that jurors look at the witness, although I encourage it.  I will take a look when we resume."

B

*The Court Had No Duty To Conduct A Hearing To Assess Juror Bias*

" 'An accused has a constitutional right to a trial by an impartial jury.  [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is " 'capable and willing to decide the case solely on the evidence before it.' " ' " (*People v. Hensley* (2014) 59 Cal.4th 788, 824.)  " 'Juror bias does not require that a juror bear animosity towards the defendant.  Rather, juror bias exists if there is a substantial likelihood that a juror's verdict was based on an improper outside influence, rather than on the evidence and instructions presented at trial, and the nature of the influence was detrimental to the defendant.' [Citation.]  'A sitting juror's involuntary exposure to events outside the trial evidence . . . may require . . . examination for probable prejudice.' " (*People v. Pettie* (2017) 16 Cal.App.5th 23, 78-79.)  Such situations may include communications with nonjurors.  (See, e.g., *Remmer v. United States* (1954) 347 U.S. 227, 228-229 [98 L.Ed. 654, 655-656]; *People v. Cobb* (1955) 45 Cal.2d 158, 161; *People v. Federico* (1981) 127 Cal.App.3d 20, 38-39.)  Similarly, juror inattentiveness is a proper reason to discharge a juror.  (See, e.g., *People v. Johnson*

9

(1993) 6 Cal.4th 1, 21-22 [juror "exhibiting various physical indicia of sleep"]; *People v. Thomas* (1994) 26 Cal.App.4th 1328, 1333 [juror inattentive to fellow jurors and court].)

"The decision whether to investigate the possibility of juror bias, incompetence, or misconduct -- like the ultimate decision to retain or discharge a juror -- rests within the sound discretion of the trial court.  [Citation.]  The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial.  [¶]  As our cases make clear, a hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his [or her] duties and would justify his [or her] removal from the case." (*People v. Ray* (1996) 13 Cal.4th 313, 343; accord, *People v. Osband* (1996) 13 Cal.4th 622, 675-676.)  The court must make whatever inquiry is reasonably necessary to determine whether to discharge the juror and whether the impartiality of other jurors has been affected.  (*People v. Linton* (2013) 56 Cal.4th 1146, 1213; *People v. Davis* (1995) 10 Cal.4th 463, 535.)  The trial court has great discretion in determining the scope of the inquiry and whether such an inquiry should be made in the first place.  (*Linton*, at p. 1213; *People v. Virgil* (2011) 51 Cal.4th 1210, 1284.)

The trial court did not abuse its discretion by failing to question jurors about the prosecutor's inaudible laughter and expressions of disbelief during Chantell's testimony. There is no indication jurors other than Juror No. 11 saw the prosecutor or that the prosecutor's conduct continued for so long that all the jurors must have seen it.  Because the fact of any contamination, let alone resulting bias, of these jurors is speculative, the court was not required to question them.  (See *People v. Fuiava* (2012) 53 Cal.4th 622, 703 [record lacked support for defendant's speculation that other jurors were unsettled by gestures of court spectators, or that any other juror even saw the alleged gestures].)

As to Juror No. 11 specifically, while the prosecutor's conduct may have been unprofessional (see *People v. Peoples* (2016) 62 Cal.4th 718, 793), we cannot conclude the court erred by failing to investigate its impact.  The prosecutor's conduct was not akin

to that typically resulting in jury misconduct, such as communication by intimidation and bribery. (See, e.g., *Remmer v. United States*, *supra*, 347 U.S. at pp. 228-229 [98 L.Ed. at pp. 655-656]; *People v. Cobb*, *supra*, 45 Cal.2d at p. 161; *People v. Federico*, *supra*, 127 Cal.App.3d at pp. 38-39.) But even if such a presumption arose, defendants have not shown a "reasonable probability of prejudice, i.e., [a] *substantial likelihood* that one or more jurors were actually biased against" them. (*People v. Pettie*, *supra*, 16 Cal.App.5th at p. 79; see also *In re Manriquez* (2018) 5 Cal.5th 785, 798.) The prosecutor was an adversary to defendants in this trial and argued defendants were guilty of the crimes charged against them. The prosecutor further cross-examined Chantell and made clear she did not believe the substance of Chantell's testimony. The fact that the prosecutor also expressed her disbelief with facial expressions and inaudible laughter is not likely to result in juror bias.

Nor did the court abuse its discretion by failing to question Juror No. 11 about her attentiveness to Chantell's testimony. Chantell's counsel said he saw indications Juror No. 11 did not want to be present. The trial court did not see the complained of expressions and said it would watch Juror No. 11 during the remainder of the evidence. Nobody subsequently brought up the topic, indicating Juror No. 11 continued watching the trial, appearing to look attentive. Further, a juror's display of inattention or discomfort at having to sit through the proceedings is not uncommon in a criminal trial, especially one of this subject matter. The law does not require jurors to sit riveted throughout the proceedings. (*People v. Williams* (1997) 16 Cal.4th 153, 230-231; *People v. Bradford* (1997) 15 Cal.4th 1229, 1348-1349.) We conclude the trial court did not err in failing to conduct an inquiry.

11

II

*The Trial Court Did Not Abuse Its*

*Discretion By Admitting The Victim's Forensic Interview*

Defendants contend the trial court erred under Evidence Code[4] sections 1360 and 352 by admitting the victim's forensic interview into evidence. The People argue defendants abandoned their section 1360 claim in the trial court, and, in any event, the trial court did not abuse its discretion under either section 1360 or section 352. We conclude the trial court considered the proper standard when making its section 1360 ruling, and that defendants have forfeited their remaining appellate claims regarding the admissibility of the victim's forensic interview.

A

*Background*

Before trial, the prosecution informed defendants it intended to introduce the victim's forensic interview into evidence under section 1360. Defendants requested the trial court review the video of the forensic interview under section 1360 subdivision (a)(2), for admissibility. This subdivision requires a trial court to review "the time, content, and circumstances" of a minor victim's statement for reliability before it can be admitted into evidence as an exception to the hearsay rule. (§ 1360, subd. (a)(2).) At no time did defendants argue a particular reason for excluding the victim's forensic interview under section 1360.

After the victim testified, defendants objected to admission of the victim's forensic interview because the interview was not relevant. Defendants reasoned that because the prosecution was not using the interview to refresh the victim's recollection or for the purpose of impeachment, the prosecution was offering the forensic interview for the sole

---

**4**     Further section references are to the Evidence Code unless otherwise indicated.

purpose of bolstering the victim's testimony, making it improper. The prosecution disagreed and argued the forensic interview was admissible under section 1360.

The trial court stated it recognized defendants' objection as being under section 352. Specifically, that the forensic interview should be excluded because it did not contribute evidence beyond that testified to by the victim. Both defendants agreed. With this understanding of defendants' objection, the prosecutor argued the forensic interview was admissible under section 352 because defendants' theory of the case was that the victim was lying at the urging of her father. The forensic interview was relevant to refute that theory by showing the victim's consistent behavior. The court agreed with the prosecutor and admitted the entire forensic interview into evidence. It also stated, "Let me preliminarily indicate that I have determined that the proffer is entirely within the ambit of [section] 1360. All of the elements are there and met. I have watched the entirety of the [forensic] interview in chambers. I have reviewed it fully, and the [prosecutor's] request is fully in compliance with the permission granted by virtue of 1360 . . . ."

B

*Section 1360*

Defendants argue it is unclear whether the trial court applied the factors from *Idaho v. Wright* (1990) 497 U.S. 805 [111 L.Ed.2d 638] as required when reviewing the victim's forensic interview for reliability. (See *People v. Eccleston* (2001) 89 Cal.App.4th 436, 445.) This argument lacks merit. Defendants requested the trial court review the victim's forensic interview for reliability under section 1360. This review "effectively incorporates" the factors in *Wright*, as well as any other factor the court believed relevant. (*Eccleston*, at pp. 445-446.) The trial court indicated it had reviewed the victim's forensic interview and found it met the requirements of section 1360. Thus, the record reflects the trial court considered the factors from *Wright* when determining reliability of the victim's forensic interview.

13

Defendants further argue the victim's forensic interview lacked indicia of reliability because several questions asked by the interviewer were suggestive, the interviewer had preconceived ideas about the victim's experience, and the victim obviously had a prior unrecorded interview. Defendants forfeited this claim by not raising a specific objection in the trial court. "[T]he rule that a challenge to the admission of evidence is not preserved for appeal unless a specific and timely objection was made below stems from long-standing statutory and common law principles." (*People v. Anderson* (2001) 25 Cal.4th 543, 586.) " '[F]ailure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable." (*People v. Seijas* (2005) 36 Cal.4th 291, 302.)

Defendants argue that while their objection may not have been specific, it was sufficient because the parties understood the purpose of the objection, and the court ruled on the issue as if an objection had been made. Not so. Defendants did not question the court's finding that the victim's forensic interview was reliable, even though the court did not address specific factors related to the interview's reliability. Indeed, when the prosecutor was prepared to address the forensic interview's admissibility under section 1360 in more detail, defendants' attorneys represented that it was unnecessary. From this interaction, we can infer defendants' understanding was that the court fulfilled its obligation under section 1360 by delivering its finding as requested. If defendants had raised specific concerns in their moving papers or objected to the sufficiency of the court's ruling, the trial court would have supplied reasons for its ruling instead of allowing defendants to attack it as insufficient on appeal. Thus, the claim is forfeited.

C

*Section 352*

Defendants argue the victim's forensic interview should have been excluded under section 352 for the same reasons it was not reliable under section 1360. This is not the grounds upon which defendants brought their section 352 claim in the trial court and is

14

merely a rebranding of their appellate claim regarding section 1360 that we concluded defendants forfeited by failing to raise in the trial court.  Accordingly, we likewise conclude defendants forfeited their appellate claim the victim's forensic interview should have been excluded under section 352.

III

*Claims Related To Accommodation Syndrome*

In *McAlpin*, our Supreme Court said, "[E]xpert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident -- e.g., a delay in reporting -- is inconsistent with his or her testimony claiming molestation. [Citations.]  'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' "  (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301 [discussing with approval Court of Appeal opinions admitting accommodation syndrome expert testimony to support its holding expert may explain why the parent of a sexually molested child would not report the abuse]; accord, *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744 [accommodation syndrome evidence is admissible for "the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation"]; *People v. Housley* (1992) 6 Cal.App.4th 947, 957 [accommodation syndrome evidence was admissible to explain child's delay in reporting rape and later recantation of charges, explaining this evidence "may -- with certain limitations -- be used to disabuse the jury of common misconceptions concerning abuse victims"].)  In California, "it has long been held that in a judicial proceeding presenting the question whether a child has been sexually molested, [testimony regarding accommodation syndrome] is admissible evidence for the limited purpose of disabusing

15

the fact finder of common misconceptions it might have about how child victims react to sexual abuse." (*In re S.C.* (2006) 138 Cal.App.4th 396, 418.)

Defendants raise several claims related to accommodation syndrome. Defendants request we revisit the long-established rule that accommodation syndrome evidence is admissible to disabuse jurors of common misconceptions. They further argue the trial court abused its discretion under their particular circumstances. Defendants also attack their attorneys' performance arguing they were ineffective by failing to object to several of the prosecutor's improper hypothetical questions posed to the accommodation syndrome expert. Finally, defendants argue the trial court improperly instructed the jury on the purpose of accommodation syndrome evidence. We disagree with each of defendants' contentions.

A

*Background*

The trial court admitted accommodation syndrome evidence over defendants' objections.

The accommodation syndrome expert testified about the history and clinical application of accommodation syndrome. He testified that accommodation syndrome was first mentioned by Dr. Roland Summit and his research team in the early 1980's. "And in their work they found that kids who had been sexually abused were doing things and saying things that a lot of people didn't anticipate or wouldn't expect. So people had expectations about how kids would act or how they would tell about being sexually abused, and what he was finding, and that group was finding, treating these kids is that wasn't always the case. So he wrote -- he and his colleagues took a lot of information from their caseloads and presented this concept of . . . Child Sexual Abuse Accommodation Syndrome, to help educate people about kids who we know were sexually abused to kind of demystify this group of kids that most people didn't know about and to challenge some misconceptions or to correct some misconceptions that

16

people had about this general population of kids." The intention of the article was to educate people who came in contact with victims of child sexual abuse, such as therapists, social workers, law enforcement, and legal professionals. Dr. Summit did not do research to come to his conclusions; instead, he observed patterns among the patients in his clinics and then wrote about it.

Accommodation syndrome consists of five components. The first is secrecy and is founded upon the understanding that child sexual abuse occurs within the context of a relationship. "[W]e can't look at child sexual abuse as an act. We don't look at the abusive act in isolation. It's occurring within the context of a relationship that the child has with their perpetrator, and this is often -- most often a trusting, loving, caring relationship that the child has with their perpetrator, where the person has ongoing access, continued sexual access to the child." Perpetrators can gain secrecy through threats and punishment or by the simple fact that they also provide emotional support and the victim would feel guilty being the cause of the perpetrator going to jail.

After discussing this concept, the prosecutor asked the following hypothetical: "For example, can the perpetrator say, *This is our secret* or *Don't tell anyone. This is private business between us*?" The expert responded, "That can absolutely happen. In fact, there's research done by a Conte and Wolf, Elliot, a lot of different people with regards [*sic*] to perpetrators. [¶] And what they have talked about is that keeping it a secret or saying, *I will keep a secret*, or being told this is private, kids trust adults and they look to adults to kind of learn the rules of intimacy and relationship building. So if someone agrees to keep something a secret, that is your word, and it's important to keep your word."

The expert then moved on to the second component, which is helplessness. This component "speaks to the fact that most kids don't bite, kick and scream to get away from their perpetrator. The idea of helplessness is really within that relationship. You have a bigger, stronger, older, more sophisticated perpetrator, and you have a younger,

17

smaller, vulnerable, certainly less sophisticated child that looks up to their perpetrator, and so the idea of them standing up to this person with more power leaves them in this helpless position, because they really can't combat a lot of sophistication, size, influence that the perpetrator has. [¶] So if the child is then being abused by the person [who] is supposed to protect them, physically, sexually, emotionally, that helplessness grows even more. And if the child feels they can't tell someone or be believed in their immediate environment or even if someone is close by because they are fearful of telling that person, that helplessness grows even more."

Following this discussion, the prosecutor asked the following hypothetical: "So do I understand you correctly: If a child is hypothetically being abused by someone who is familiar to them, in a loving position, that that helplessness can actually increase because of the relationship that the child has with the perpetrator or the perpetrators?" As part of the expert's response, he said the research supported an inference that the closer the relationship between the victim and the perpetrator, the harder it can be to disclose abuse to others. The prosecutor then asked whether this dynamic increased if the perpetrators were basically "teaching the child to engage in sexual acts?" The expert agreed, testifying that a reason a victim may not kick and scream to get away from their perpetrators is because they do not realize the touching is inappropriate. "[I]f a legitimate authority is teaching you to do certain things and you trust that person, that this is an okay thing to do or it's normal for us to do this, there may not even be a reason to tell about it, and that can leave that child even more helpless to be protected, because they are not talking about the inappropriateness; one, not being aware of it possibly, and two, *It's just the way this relationship works, and, it's a relationship I care about and like*."

The expert then moved on to the third component, which is entrapment and accommodation. This component accounts for a child victim's coping mechanisms in his or her life to adjust to the abusive relationship. This can manifest itself in physical changes, such as avoiding certain rooms in the house or wearing an extra pair of pajamas.

18

There are also emotional or cognitive things child victims can do to cope, such as repress feelings of guilt, shame, and fear, as well as disassociate from reality during the abusive conduct.

After this discussion, the prosecutor asked the following hypothetical: "Can children accommodate or cope by actually going along with the abuse that's happening and participate in it?" The expert agreed they could and testified that many children in his practice go along with the abuse to make it stop or from fear something worse will happen. The prosecutor followed up by asking, "Would you consider if a child wanted to please their abusers, is that fitting into the coping mechanism that you, in your training and experience as well as Dr. Summit's observations, does that fit into what we would call coping or accommodation?" The expert believed it did, explaining that victims may be seen as wanting to please the abuser because the abusive conduct is occurring within a relationship where a child often wants the abuser to be proud of them. The child further knows that this conduct makes the abuser proud so the child will engage in it to make the abuser proud.

The fourth component of accommodation syndrome is delayed and unconvincing disclosure. This component accounts for the reality that most child victims of sexual abuse do not tell someone about it right away; in fact, only 20 percent will report within the first month, with 40 to 60 percent of victims reporting within the first year. Unconvincing or conflicting disclosure is a result of a child's development and memory. "And so a lot of times people expect or want to have information given to them consistently in the same way each time they are told about it to be convinced of it. Kids don't work that way. Memory does not work that way. [¶] And so it's not uncommon for kids to be inconsistent or unconvincing in the way that they talk about being abused. [¶] Some of that is related to emotional display. A lot of times people expect kids to appear sad or angry or just horrified if they are talking about sexual abuse."

19

After this discussion, the prosecutor asked the expert the following hypothetical: "[B]ased on your training and experience and the research that you are aware of, do children disclose when they eventually feel safe and they are out of -- out of the relationship with the perpetrator?" The expert responded, "[W]hen kids feel like they are going to be heard, when they feel like they are going to be supported and, say, believed, those are conditions where kids will be more likely to tell." The expert continued, "So really it does often become when the child is removed from that relationship or far more distance from having ongoing access to that person, we might see kids more comfortable talking about it."

Finally, the fifth component of accommodation syndrome is retraction. The expert explained that studies show between 16 and 22 percent of legitimate victims of child sexual abuse retract their allegations, representing a "minority" of cases.

B

*Accommodation Syndrome Evidence Is Not Inadmissible As A Matter Of Law*

Defendants contend expert evidence regarding accommodation syndrome is irrelevant and unduly prejudicial as a matter of law because it is no longer common for jurors to hold the misconceptions addressed by the expert's testimony and the evidence is likely to be used as evidence of guilt. As support, defendants cite to a research study " 'suggesting that laypeople tend to believe that delayed disclosure is common' " among child sexual abuse victims. They also point to out-of-state cases for the propositions that jurors are equipped to understand the concepts underlying accommodation syndrome without the assistance of expert testimony and accommodation syndrome evidence is likely to be unduly prejudicial. We review this claim de novo. (*People v. Gonzales* (2018) 6 Cal.5th 44, 49 [questions of law reviewed de novo].)

We decline defendants' invitation to deviate from *McAlpin* and its progeny. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [appellate courts must follow California Supreme Court decisions].) Moreover, we are not bound by out-of-

20

state or federal circuit cases (*People v. Troyer* (2011) 51 Cal.4th 599, 610 [out-of-state cases not binding on California courts]; *People v. Williams* (2013) 56 Cal.4th 630, 668 [federal appellate authority not binding on California courts]) and, as courts have recently explained, "the vast majority of jurisdictions . . . have rendered decisions that are consistent with *McAlpin*." (*People v. Munch* (2020) 52 Cal.App.5th 464, 472; see also *King v. Commonwealth* (Ky. 2015) 472 S.W.3d 523, 534-535 (dis. opn. of Abramson, J.) [41 states recognize the admissibility of accommodation syndrome expert testimony for some purpose, and six states have rejected any type of accommodation syndrome testimony].)

We likewise reject defendants' argument that accommodation syndrome evidence is inadmissible because the sexual molestation of children no longer falls outside the common experience of jurors. We cannot assume from the research study defendants cite or the advancement in technology and communication since *McAlpin* that the average juror is familiar with the behavior of child victims of sex crimes, or that expert testimony on the subject would be unhelpful to the jury. (See *People v. McAlpin*, *supra*, 53 Cal.3d at pp. 1299-1300 [even when the jury has some knowledge of the subject matter, expert opinion may be admitted whenever it would assist the jury].) Accordingly, testimony related to accommodation syndrome is not inadmissible as a matter of law.

C

*The Trial Court Did Not Abuse Its Discretion*

*By Admitting Accommodation Syndrome Evidence*

Defendants argue the court erred by admitting accommodation syndrome evidence because the prosecution made no showing defendants' jury held misconceptions related to child sexual abuse victims. We review the trial court's decision to admit specific accommodation syndrome evidence for an abuse of discretion. (*People v. Powell* (2018) 6 Cal.5th 136, 162 [rulings on admissibility of evidence reviewed for an abuse of discretion].)

21

Initially, we note the prosecutor was not required to show defendants' jury held misconceptions related to the behavior of child sexual abuse victims before seeking admission of accommodation syndrome evidence. Accommodation syndrome evidence is admissible "to rehabilitate [a child] witness's credibility when the defendant suggests that the child's conduct after the incident -- e.g., a delay in reporting -- is inconsistent with his or her testimony claiming molestation." (*People v. McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1301.)

Here, defendants' defense was that the victim fabricated the sexual abuse at the behest of her father so he could take her out of state to live with him and his new family. To prove this, defendants pointed to the closeness of their relationship with the victim until she went to live with her father. Because defendants asserted the victim's conduct was inconsistent with her allegations of abuse, accommodation syndrome evidence was admissible to rehabilitate the victim's credibility. Accordingly, the trial court did not abuse its discretion.

D

*Defendants' Attorneys Were Not Ineffective*

It is improper for an expert to testify about accommodation syndrome in a manner that directly coincides with the facts of the case. (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394; *People v. Roscoe* (1985) 168 Cal.App.3d 1093, 1099-1100 [expert testimony must be limited to a discussion of victims as a class; the expert must not discuss the witness in the case].) It is error to admit an accommodation syndrome expert's response to hypothetical questions that closely track the facts of the case. (*People v. Jeff* (1988) 204 Cal.App.3d 309, 337-339.) For instance, in *Jeff*, two experts for the prosecution testified: the first described the victim's symptoms based on interviews with the victim, and the second described child molest syndrome. The prosecution prefaced the testimony in the opening statement by stating that the second expert would tell the jury " 'what these symptoms mean.' " (*Id*. at p. 338.) The

prosecution then asked the second expert a series of hypothetical questions that incorporated "the exact same facts and details" as those in the allegations against the defendant. (*Ibid*.) The expert explained the victim's "emotions, fears, and reactions to others are symptoms exhibited by a child molest victim." (*Ibid*.) The Court of Appeal held this evidence inadmissible because the expert's testimony "told the jury that [it] should accept" the victim's version of events. (*Ibid*.)

Based on this authority, defendants argue their attorneys were ineffective for failing to object to several improper hypothetical questions posed by the prosecutor to the accommodation syndrome expert. To establish ineffective assistance of counsel, defendants must show that: (1) their attorneys' performances fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performances prejudiced defendants. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-689 [80 L.Ed.2d 674, 693-694].) Courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (*Id.* at p. 689 [80 L.Ed.2d at p. 694].)

Defendants have not met their burden to show their attorneys were ineffective. First, the prosecution did not present any expert testimony based on interviews or examinations of the victim. The accommodation syndrome expert testified he had never interviewed the victim or any other witnesses in the case; he had never been told the facts of the case; and he had never reviewed any police reports or other materials related to the case. Second, while the challenged hypothetical questions generally bore similarities to the victim's situation, neither the questions nor the expert's responses tracked the victim's conduct so closely that the evidence "told the jury" it should believe the victim's allegations. Third, the expert specifically testified that the elements of accommodation syndrome could not be "used in the reverse order" to say that if a child is displaying that

23

conduct then the child must have been abused.  He emphasized that accommodation syndrome is "not a diagnostic tool."  Thus, we perceive no error in the prosecutor's questions and no error in defendants' attorneys' failure to object to them.

E

*The Trial Court Properly Instructed With CALCRIM No. 1193*

Defendants contend the trial court erred by instructing the jury with CALCRIM No. 1193 regarding the proper use of accommodation syndrome evidence.  Specifically, defendants argue the court's instruction allowed the jury to use accommodation syndrome evidence to assess the truth of the victim's claims, contrary to case law.  (See *People v. Housley*, *supra*, 6 Cal.App.4th at p. 959 ["in all cases in which an expert is called to testify regarding [accommodation syndrome] we hold the jury must sua sponte be instructed that . . . the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true"].)  We review de novo the question of whether a jury instruction correctly states the law.  (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

The trial court instructed the jury:  "You have heard testimony from [an expert] regarding Child Sexual Abuse Accommodation Syndrome.  [The expert]'s testimony about Child Sexual Abuse Accommodation Syndrome is not evidence that the Defendant committed any of the crimes charged against him or her.  You may consider this evidence only in deciding whether or not [the victim]'s conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony."

Defendants' claim was rejected in *People v. Gonzales* (2017) 16 Cal.App.5th 494.  We agree with that court that "[t]he purpose of [accommodation syndrome evidence] is to understand a child's reactions when [he or she] ha[s] been abused.  [¶]  A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert's] testimony to conclude that [the child's] behavior does not mean she lied when she said

24

she was abused.  The jury also would understand it cannot use [the expert's] testimony to conclude [the child] was, in fact, molested.  The [accommodation syndrome] evidence simply neutralizes the victim's apparently self-impeaching behavior.  Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the child's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the [accommodation syndrome] evidence does not show she had been molested.  There is no conflict in the instruction." (*Gonzales*, at p. 504; accord, *People v. Munch*, *supra*, 52 Cal.App.5th at p. 474.)

Defendants disagree arguing the instruction's biggest flaw is that it fails to inform the jury it cannot use accommodation syndrome evidence to determine whether the victim's claim is true.  But the instruction informs the jury accommodation syndrome evidence "is not evidence that the Defendant committed any of the crimes charged against him or her," i.e., whether the allegations are true.  Defendants equate credibility of a witness with truth of an allegation.  Those concepts are not the same, especially where, as here, the jury was instructed it must not consider this evidence when determining guilt.  Indeed, the jury was instructed it must consider all the evidence when making that determination, excluding accommodation syndrome evidence.  We presume the jury followed these instructions.  (See *People v. Smith* (2007) 40 Cal.4th 483, 517 [" '[t]he crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions' "].)

Defendants further argue the effect of the instruction is that the jury will always view a victim's past conduct as confirming the victim's credibility.  This is particularly prejudicial when often that conduct, e.g. family interactions, is the only evidence a defendant can use to impeach a victim.  We disagree.  CALCRIM No. 1193 does not tell the jury it can use accommodation syndrome evidence to corroborate the victim's testimony.  Instead, the instruction informs the jury that the victim's conduct may not be

probative to credibility regarding her allegations of sexual abuse. Accordingly, the trial court did not err by instructing the jury with CALCRIM No. 1193.

## IV

### *The Trial Court Did Not Abuse Its Discretion By*

### *Admitting The Condensed Version Of Defendants' Pornography Searches*

Defendants contend their Internet searches for lawful pornography should have been excluded under sections 1101 and 352. We disagree.[5]

## A

### *Background*

Defendants moved in limine to exclude their Internet pornography searches because the evidence was highly prejudicial and improper character evidence. These searches were conducted on legal pornography Web sites and did not include the participation of minors. The prosecutor proffered several of the searches as including: "A couple rapes teen together"; "Dad looks at daughter's pussy"; "Stepdad plays with pussy till daughter comes"; "Dad fucks daughter in front of mom"; "Dad plays with daughter's pussy"; "Sexy daughter sucks daddy's dick"; "Father molested daughter while sleeping"; "Beautiful mom came home, caught father, daughter having sex." The trial court determined the pornography searches admissible to the extent the searches included preteen and father-daughter, role-play.

---

[5] Defendants assert in the introduction to this argument that evidence relevant to Chantell's consciousness of guilt should have also been excluded. They, however, do not develop this contention in their argument. The contention is thus forfeited. (See *Interinsurance Exchange v. Collins* (1994) 30 Cal.App.4th 1445, 1448 ["parties are required to include argument and citation to authority in their briefs, and the absence of these necessary elements allows this court to treat appellant's [contention] as [forfeited]"].)

## B

### *There Was No Abuse Of Discretion*

Defendants argue their Internet searches were inadmissible character evidence because the searches were too "attenuated" to "establish intent under . . . section 1101, subdivision (b), and certainly if the acts that [the victim] described were believed, sexual intent was not an issue. As [Richard's trial] attorney argued, this evidence is inadmissible character evidence for which there is no exception or basis for admission." We disagree.

Section 1101, subdivision (a), prohibits the admission of evidence of uncharged acts to prove propensity or disposition to commit the charged crime. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393; *People v. Hendrix* (2013) 214 Cal.App.4th 216, 238.) However, subdivision (b) of that section provides that such evidence is admissible "when relevant for a noncharacter purpose . . . such as 'motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake [of fact] or accident.' " (*Hendrix*, at p. 238.) " 'Evidence of uncharged [acts] is admissible to prove identity, common design or plan, or intent only if the charged and uncharged [acts] are sufficiently similar to support a rational inference of identity, common design or plan, or intent.' " (*People v. Lenart* (2004) 32 Cal.4th 1107, 1123.)

*Ewoldt* provides the framework to analyze defendants' claim: "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act. . . .' [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' " (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 402.)

The similarities between the conduct described in the pornography searches and the conduct the victim testified defendants invited and taught her to do is sufficient to overcome the fact that defendants sought pornography from legal sources. Defendants' searches went beyond an interest in incest and father-daughter fantasy role-play and described the specific sex acts defendants taught the victim to engage in. Indeed, some of the pornography searches included depictions of parents teaching sex acts to their daughter. This is sufficiently similar to the charged conduct to justify admission for the purposes of showing intent.

We further disagree with defendants' premise that intent was not at issue in this case. " '[A] fact -- like defendant's intent -- generally becomes "disputed" when it is raised by a plea of not guilty or a denial of an allegation. [Citation.] Such a fact remains "disputed" until it is resolved.' [Citation.] [¶] A defendant may seek to limit the admissibility of . . . evidence by stipulating to certain issues. However, defendant did not do so here." (*People v. Scott* (2011) 52 Cal.4th 452, 471.) Here, the prosecution had the burden of proving defendants acted with a lewd and lascivious intent. (CALCRIM No. 1110.) Defendants' pornography searches tended to prove they acted with a sexual intent when grooming the victim to engage in the exact behavior depicted in the pornography. Accordingly, the court did not abuse its discretion under section 1101, subdivision (b).

Similarly, defendants' argument the evidence should have been excluded because its relevance was outweighed by its prejudicial effect lacks merit. Evidence is inadmissible under section 352, "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Evidence is unduly prejudicial if it uniquely tends to evoke an emotional bias against a party as an individual, or if it would lead the jury to prejudge a person or cause on the basis of extraneous factors. (*People v. Foster* (2010) 50 Cal.4th 1301, 1331.)

28

Defendants argue evidence of their lawful pornography searches was unduly prejudicial because the titles of the videos were inflammatory, and the searches were relatively few in relation to the total number of pornography searches conducted. We are not persuaded. There is no delicate way to describe specific sex acts between a father and a daughter with the participation and urging of a mother. " ' "The prejudice that section 352 ' "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors." ' " ' [Citation.] That the evidence provided evidence of some of the elements of the prosecution's case thus does not weigh against its admission." (*People v. Tran* (2011) 51 Cal.4th 1040, 1048.)

Further, many of the challenged searches are searches inputted by defendants. While only some of defendants' pornography searches related to father-daughter, role-play, the jury was informed of that fact, minimizing potential prejudice. On balance, the perceived prejudice did not outweigh the relevance such evidence offered concerning defendants' intent. Accordingly, the trial court did not abuse its discretion.

V

*Counsel Was Not Ineffective*

Defendants contend their attorneys were ineffective for failing to object during the prosecutor's rebuttal argument when discussing the victim's actions speaking louder than her words. The prosecutor concluded the discussion as follows: "So it is about [the victim], and actions do speak louder than words, and you don't give a child molester the benefit of the doubt. You don't." The prosecutor then spoke of the burden of proof: "The burden of proof is on the People. The People have to prove to you that these charges have been committed by those defendants beyond a reasonable doubt. Beyond a reasonable doubt. Not beyond all doubt. Beyond a reasonable doubt. Without speculation. With looking at the evidence. With deciding what the facts are, because you

29

are those judges of the facts." Such argument, defendants contend, amounted to a prejudicial misstatement of the burden of proof, requiring reversal.

We can dispose of defendants' claim on prejudice grounds. (See *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1008 [when it is easier to dispose of an ineffective assistance of counsel claim on lack of prejudice grounds, it is not proper to do so without first determining whether counsel's performance was deficient].) Although the prosecutor's statement may have been inappropriate, the jury was properly instructed on the reasonable doubt standard (CALCRIM No. 220) and on the jurors' duty to follow the law as stated by the court and to disregard any conflicting law stated by the attorneys during argument (CALCRIM No. 200). We presume the jury followed these instructions. (See *People v. Smith*, *supra*, 40 Cal.4th at p. 517.) Further, the prosecutor's statement was fleeting and immediately followed by a proper explanation of the burden of proof. That is: "The burden of proof is on the People. The People have to prove to you that these charges have been committed by those defendants beyond a reasonable doubt. Beyond a reasonable doubt. Not beyond all doubt. Beyond a reasonable doubt. Without speculation." Defendants' attorneys were not ineffective.

## VI

### *The Trial Court Did Not Abuse Its Discretion By Denying*
### *Defendants' Motion For A Mistrial Based On Prosecutorial Error*

Defendants argue the trial court erred by denying their motion for a mistrial based on the prosecution's inadvertent submission of excluded evidence to the jury during deliberations. We disagree.

### A

### *Background*

As part of motions in limine, the court excluded reference to a prior interaction Chantell had with the Santa Barbara Police Department. The prosecutor agreed with its

30

exclusion, subject to revisiting the issue if the information became relevant because of Chantell's testimony.

During cross-examination of Chantell by Richard's attorney, Chantell was asked whether she had ever had interactions with police. Chantell said she had never been in serious trouble before and had never had charges brought against her. When asked again whether she had had prior interactions with police, Chantell said no.

During jury deliberations, the jury submitted the following question: "Chantell was arrested in S[ants Barbara] on December 23, 2017. Is a police report available? Are we allowed to see the police report for the Gosztylas' arrest[?]" Based on this question, defendants requested a mistrial. They surmised the jury learned of Chantell's Santa Barbara arrest from a prosecution exhibit; however, defendants were not sure and did not know the extent of the jury's exposure to the excluded evidence. In any event, defendants believed the jurors' exposure to this excluded evidence was incurably prejudicial because there was no way to prevent juror speculation on the issue and the arrest impeached Chantell's testimony she had never had interactions with police.

The trial court denied defendants' mistrial motion. It reasoned that while the evidence of Chantell's Santa Barbara arrest had been excluded before her testimony, it was not necessarily inadmissible in light of her testimony. Further, jurors were often exposed to evidence not admitted at trial and an instruction to disregard such evidence is commonly and effectively utilized in those instances. The trial court instructed the jury as follows: "1. The police reports are not evidence. [¶] 2. Do not consider for any purpose whatsoever any 'arrest in SB' or any arrest that may or may not have occurred on December 23, 2017. It's not relevant. It has nothing to do with this case." The trial court also removed the offending references from a prosecution exhibit available to the jury.

31

B

*Defendants Were Not Incurably Prejudiced*

"A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged," and we apply "the deferential abuse of discretion standard to review a trial court ruling denying a mistrial." (*People v. Bolden* (2002) 29 Cal.4th 515, 555.) " 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' " (*People v. Avila* (2006) 38 Cal.4th 491, 573.)

We agree with defendants that the prosecutor's inadvertent submission of excluded evidence to the jury constituted prosecutorial error. (See *People v. Hill* (1998) 17 Cal.4th 800, 822 [the defendant need only show the prosecutor's error prejudiced his right to a fair trial, regardless of whether the misconduct was intentional or inadvertent]; see also *People v. Jasso* (2012) 211 Cal.App.4th 1354, 1362 ["the rubric of prosecutorial misconduct embraces a prosecutor's inadvertent and negligent objectionable statements to the jury"].)

Still, the prosecutor's error did not require the court to declare a mistrial. "As [our Supreme Court has] explained, '[a] trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged . . . .' " (*People v. Schultz* (2020) 10 Cal.5th 623, 673.) Here, the jury showed an interest in multiple police reports, all of which pertained to defendants' arrests -- Chantell's Santa Barbara arrest and defendants' arrests for the charged offenses. The jury's question, as the trial court noted, did not imply it was looking to these police reports for any particular purpose beyond curiosity. The trial court's response that police reports were not evidence reasonably served to dispel the jury's curiosity by unequivocally informing it police reports were irrelevant to its determination. The trial court's additional admonishment not to consider Chantell's Santa Barbara arrest that "may or may not have occurred on December 23, 2017" further neutralized potential prejudice by informing the jury the arrest was

32

irrelevant for all purposes and may not have been accurately reflected in the material the jury was provided. Finally, the court removed the offending information from the jury room, making it so the jury could not revisit the material. In all, the jury was left with the charge that police reports were irrelevant and Chantell's Santa Barbara arrest, if it happened at all, was not to be considered for any purpose. "We presume that a jury follows the court's admonishments." (*Ibid*.) Accordingly, the trial court did not abuse its discretion by denying defendants' motion for a mistrial.

## VII

### *There Was No Cumulative Error*

Defendants argue that, while no error may have sufficiently prejudiced them to require reversal, the cumulative prejudice from the isolated errors did. We have concluded no error occurred in the trial court, thus we discern no cumulative error.

## VIII

### *Correct Abstract Of Judgment*

During its oral pronouncement of judgment, the trial court imposed various fines and fees on Chantell. Specifically, it ordered Chantell to pay a $10,000 restitution fine and "[f]or the remainder of fees and fines and the like, I am imposing only minimum mandatory fines or fees; nothing that is not required and nothing more than the minimum." It further imposed and stayed a $10,000 parole revocation fine. Chantell's abstract of judgment reflects the court ordered her to pay a $6,000 restitution fine to the victim's restitution fund in addition to the orally imposed $10,000 restitution fine and matching parole revocation fine. The abstract of judgment also reflects a $400 court operations assessment, a $300 conviction assessment, a $430 "Serious Habitual Off. Prog." fee, a "$453.62 booking fee," and a "$90.65 class fee." The minute order from the sentencing hearing reflects the imposition of a $10,000 restitution fine and a matching parole revocation fine. It further reflects a $6,000 fine to be paid to the victim's father, as well as a $300 "CFF" assessment and a $400 "COA."

Chantell contends the court never orally imposed the $6,000 restitution fine reflected in her abstract of judgment and sentencing minute order and the serious habitual offender program fee, booking fee, and classification fee described in her abstract of judgment are not mandatory fees. Thus, those fines and fees must be stricken from her abstract of judgment and the minute order. Richard joins in this argument; however, he makes no argument specific to his own circumstances.

Typically, we would treat Richard's claim as forfeited. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363 ["[a]ppellate counsel for the party purporting to join some or all of the claims raised by another are obligated to thoughtfully assess whether such joinder is proper as to the specific claims and, if necessary, to provide particularized argument in support of his or her client's ability to seek relief on that ground"].) The People, however, address this argument in the context of Richard's imposed fines and fees and note the trial court orally imposed on Richard the exact fines and fees as Chantell, and Richard's minute order and abstract of judgment reflect the same fines and fees reflected in Chantell's minute order and abstract of judgment. The People further concede defendants are correct and we must order their abstracts of judgment and sentencing minute orders corrected to reflect the court's oral pronouncement. We will thus address Richard's claim along with Chantell's claim.

We agree with the parties that the court did not orally impose a $6,000 restitution fine to be paid to the victims' compensation fund and thus that fine must be stricken from defendants' abstracts of judgment and sentencing minute orders. (See *People v. Zackery* (2007) 147 Cal.App.4th 380, 385 ["[w]here there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls"].) We further agree that because the "Serious Habitual Off. Prog." fee, the "booking fee", and the "class fee" described in defendants abstracts of judgment are not mandatory fees (see Penal Code, § 290.3, subd. (a) [habitual offender

34

fee]; Gov. Code, § 29550 [county jail booking and classification fee]), the court did not orally impose them and they too must be stricken.

## DISPOSITION

The judgments are affirmed. The trial court is ordered to strike the $6,000 restitution fine from defendants' abstracts of judgment and sentencing minute orders, as well as the "Serious Habitual Off. Prog." fee, the "booking fee," and the "class fee" from defendants' abstracts of judgment. The trial court is directed to forward corrected copies of defendants' abstracts of judgment to the Department of Corrections and Rehabilitation.


/s/
Robie, J.


We concur:


/s/
Hull, Acting P. J.


/s/
Murray, J.